Daniels, J.
The action was brought to recover possession of seventy-three mortgage bonds of the Jefferson, Madison and Indianapolis Railroad Company, of the denomination of $1,000, and twenty-three mortgage bonds of the like denomination of the Indianapolis, Bloomington and Western Railroad Company. These bonds belonged to and were the property of John B. Thompson, the testator, in April, 1874. At that time he was dealing in stocks through Capron & Meriam, stock brokers in the city of New York. They had purchased stocks for him under his authority and in the course of their business, and they called upon him to furnish them with margins to have the stocks purchased, or to be purchased, held and carried by them. These bonds were all transferred to the brokers, and receipts taken for them, stating that they were to be held as margin on his individual stock transactions. The bonds were payable to bearer, and in the usual form of railway securities.
These brokers were customers of the St. Nicholas National Bank, making deposits and obtaining money from that institution, and they delivered all the bonds to the bank to be held by it for the loans and indebtedness of the brokers. ' They failed on Monday, the 20th of April, 1874, and the testator was soon afterwards informed that these bonds had been passed into the possession of the bank. He demanded their possession from the bank, but their delivery to him was refused, and he commenced this action on the 18th of April, 1880, six years after the delivery of the bond to the bank. Before the bonds were transferred and delivered to the bank, and in December, 1878, the brokers made the following agreement with the bank:
Agreement dated the 2d day of December, 1873.
We hereby agree with the St. Nicholas National Bank of New York, in the city of New York, that in case we shall become, or be, at any time, indebted to said bank for money lent or paid to us for our account or use, or for any overdraft in any sum or amount then due and payable, thé said bank may, in its discretion, sell at the broker’s board or at public auction or private sale, without advertising the same, and without notice to us, all, any and every collateral securities, things in action and property held by said bank for securing the payment of such debt, and apply the proceeds to the payment of such indebtedness, the interest thereon, and the expenses of the sale, holding ourselves responsible and liable for the payment of any deficiency that shall remain unpaid after such application.
OAPRON & MERIAM.
And under its authority the bonds were sold by the bank to pay the deficiency in the account of the brokers with it. *112 Before the sale of the bonds took place, notice of their sale was delivered to the testator, but prior to the time mentioned in it for the sale of the bonds, thirty-eight of them were otherwise disposed of. And the right to sell in that manner having been reserved in the agreement which the brokers made with the bank, bat even if it had not been, the testator does not appear to have been injured by the sales of these bonds. For it was agreed between the attorneys preceding the trial, and their stipulation was used as-evidence in support of the facts mentioned in it, that the bank had used its best efforts to procure as large a price as-possible for all the securities pledged to it by Capron & Meriam, including the bonds in suit. And that was all which either the agreement or the obligations of good faith required on the part of its officers. To relieve it from liability if it had the right to sell and dispose of the bonds. The others were sold pursuant to the terms of the notice, and so were all the securities pledged to the bank by Capron & Meriam. After these sales were made, and the proceeds fully realized, the cashier of the bank testified that a small balance amounting to about the sum of eighteen hundred dollars still remained unpaid upon their indebtedness to the bank.
The necessity for selling the bonds to pay the indebtedness of Capron & Meriam to the bank was denied on behalf of the plaintiffs, and it was claimed by their counsel that if any sale whatever of these bonds became necessary, that a portion of them still remained after paying all the indebtedness of Capron & Meriam. This position is advanced upon the fact that on the 18th of April, the brokers deposited with the bank the sum of $211,263.51, and that this deposit should be first applied to the payment of their indebtedness, before resort could legally be had to the bonds. This position is sound, and it was really not denied on the part of the bank, but evidence was given to show the fact to be that after applying this deposit to the payment of the indebtedness of the brokers, there still remained so large an amount owing from them, as to exhaust the proceeds of these bonds. It was stated by the same witness, that an indebtedness against the brokers of $28,657.31 existed in favor of the bank at the time when the deposit was made, which reduced the amount of the deposit itself, as the bank had the right to apply so much of it as was necessary to the payment of this balance, to the sum of $182,606.20. It was further shown that on the 18th of April the bank certified checks, which were produced in court, for Capron & Merriam, to the amount of $236,802.70, and paid other checks of theirs through the clearing house on the same day to the amount of $17,529.67, and in cash over the counter the *113 sum of $200, making in all the sum of $254,742.37, which the brokers were indebted to the bank for checks paid through the clearing house, checks certified and cash over the counter. Deducting from this the balance of their deposit on the 18th of April, left due to the bank the sum of $72,136.17, for which it held and afterwards sold the bonds in controversy. And, as already stated, their proceeds failed to extinguish the entire amount of this indebtedness. It was agreed by the stipulation that the bonds went into the possession of the defendant prior to the making of the certifications, on the 18th of April, 1874, and that the certifications were made on the faith of the deposit of the bonds, and all such other securities as were held by the bank for the account of Oapron & Meriam.
The brokers were not, in fact, authorized to use the testator’s bonds in this manner, but by this evidence the bank proved the fact to be, that it had received the bonds in the usual course of business, and for value afterwards advanced upon their faith and security. And that was all that was required to satisfy the rule so elaborately discussed by the counsel for the plaintiff, and stated in the opinion in Davis Sewing Machine Co. v. Best (105 N. Y., 59, 64; 6 N. Y. State Rep., 779, 780). The burden was upon the defendant to prove that the bonds had been received by it in good faith, and that it had parted with value for them, entitling it, so far, to be protected as a bona fide holder. And its proof exhibited that to be the truth of the case.
But the main reliance of the plaintiffs for the support of their action has been placed upon section 5208 of the Revised Statutes of the United States. By this section it has been provided that: “It shall be unlawful for any officer, clerk or agent of any national banking association to certify any check drawn upon the association, unless the person or company drawing the check has on deposit with the association at the time such check is certified, an amount of money equal to the amount specified in such check. Any check so certified by duly authorized officers shall be a good and valid obligation against the association; but the act of any officer, clerk or agent of any association, in violation of this section, shall subject such bank to the liabilities and proceedings on the part of the comptroller, as provided for in section 5234.
Under this enactment, it is insisted on behalf of the' plaintiffs that the bank was incapable of taking or receiv- - ing these bonds by way of security for its own certified checks.
And that so far as they were sold to pay the indebtedness of Oapron & Meriam on such checks, the sale was illegal" *114 and the plaintiffs were entitled to recover. But while the statute has forbidden the officers, clerks or agents of national banking associations from certifying checks unless the person or company drawing the check has. on deposit with the association at the time that such check is certified, an amount of money equal to the amount specified in such check, it has not declared the check so certified to be inoperative or unlawful against the bank itself. But it has provided on the contrary that the check, or checks, so certified shall be good and valid obligations against the association. And the only effect declared to result from the act of certification is, that the association shall be liable to proceedings on the part of the comptroller for its dissolution. If it had provided that the check certified without an equal amount of money being on deposit in the bank, should be void, or if it had not provided that such check or checks should be a valid obligation against the association, there would be ground for the position taken in behalf of the plaintiffs. For an obligation made in violation of a statutory provision forbidding it, is, under ordinary circumstances, inoperative and void. But this section of the statute was not enacted in such a manner as to allow so extensive an application of its provisions. The principle upon which that application depends was rejected by the law making authority. And notwithstanding the fact that the certification of the checks was forbidden, as Capron & Meriam did not have the amount of money on deposit with the bank to justify the certification, the law still declared the checks so certified to be good and valid obligations against the association. And assuming them to be so, as that must be done under this provision of the statute, the association was vested with the resulting or incidental right to accept and receive securities which would indemnify and protect it against liability upon these good and valid obligations. This right necessarily results from the fact that by the certifications the bank became legally liable to pay the amounts for which the checks were certified. And being legally liable to that extent, no provision of law has forbidden it to protect itself against such liability by accepting and receiving securities which would be valid in its possession, against any other legal obligation assumed for the benefit of the person or persons delivering to it such securities. No authority has been cited or found going so far as to throw the least qualification of this legal principle resulting as it does from the the language of this enactment. But so far as authorities have been cited arising under the national banking law, they support the inability of the plaintiff to maintain his right to recover the bonds under this section of the banking law.
*115 In the case of Nat. Bk. of Genesee v. Bostwick (71 N. Y , 161), the mortgage whose validity was passed upon and condemned by the court was given in violation of a prohibition contained in the national banking law which was subjected to no such qualification as this prohibition has been concerning the certification of checks. And the decision in that case proceeded further than the supreme court of the United States was willing to extend the prohibition of the law. For in the same case under the name of National Bank v Whitney (103 U. S., 99), it was held by the court, reversing this decision of the court of appeals, that the United States was the only party that could take advantage of this violation of the statute, and that the mortgage itself was capable of being enforced against the surplus in favor of the party holding and insisting upon it. And this was, again followed and sanctioned in Fortier v. New Orleans Bank (112 U. S., 439, 451). A further ruling, important in its effect upon the present controversy was made in National Bank v. Stewart (107 U. S., 676), where it was held, although the statute prohibited loans by national banks on the security of the shares or their own capital stock, that the transaction could •not be questioned by a party to it, after the shares themselves, had been sold and their proceeds applied as the bonds, and their proceeds have, in this case, to the extinguishment of the indebtedness. In all these authorities, the principle or policy embodied in this section of the statute had been followed, that the transaction can only be regularly questioned by the authorities of the United States in a proceeding against the association for its violation of the statute. This principle, although supported by the general policy of the law, was not so directly applicable in the other cases as it is-in this, for here it has. been incorporated into and made a part of the section itself. And it is the only legal consequence or result which the law has declared shall follow from the certification of the checks, where the drawer has not on deposit with the association at the time, an amount of money equal to the amount specified in the certified checks. The court was, therefore, right in holding at the trial that the bank became a holder for value of the bonds in controversy, by certifying these checks for Capron & Meriam, from whom the bonds for this object had been previously received.
The Indianapolis, Bloomington and western bonds were surrendered by the defendant to the Union Trust Company on a plan for the reorganization of the railroad company, for which certificates were issued which stood in lieu of the bonds, and these certificates were sold at the same time with the other securities. This surrender became a necessity be-case of the reorganization of the railroad company, and it-was not made in violation of any of the obligations of the bank. But if it had been, the violation would be no more than technical in its effect, for the plaintiff was, in no man *116 ner inj ured by the change. No loss whatever appears to have resulted to him, or in these securities, by the change which then was made. Neither was the bank involved in any liability because of. the demand made on behalf of or by, the testator for the delivery of the bonds to him. For as long as the bank held them as legal securities for its protection against the moneys it had paid upon the certified checks, it was not bound to surrender or deliver them to the testator without the payment or tender of the amount of the indebtedness for which it held the bonds.
At the close of the case each of the parties requested the court to direct a verdict in their favor. The plaintiff’s counsel added to this the further request that the case should be submitted to the jury on the fact whether the defendant was not liable for the full value of the Jefferson, Madison and Indianapolis railroad bonds which they sold without notice to him, and whether he was entitled to have applied on the bank’s account their market price which they would realize in extinguishment of the bank’s claim, leaving the rest of the securities free and clear. This was the Only request made for the submission of any part of the controversy to the jury. And that was regularly refused for the reason already stated, that in the disposition of the bonds the defendant had used its best efforts to procure as large a price as possible for them when they were sold. Upon the credibility of the witnesses, no desire was expressed to submit the case to the jury, but in all other respects than that just stated, it was presented by the counsel on each side as dependent upon the application of legal principles. And it was so disposed of by the court in the direction given to the jury to render a verdict for the defendant. Neither of the exceptions taken rest upon the violation of any legal rule, but the case was disposed of as the facts required it to be at the trial, and the plaintiff’s motion should be denied, and judgment directed for the defendant on the verdict, with costs.
Van Brunt, P. J., and Brady, J., concur,